**UNITED STATES of America,**
**Appellant,**

**v.**

**Delora Huff PAGE, individually and as Guardian Ad Litem of Stanley James Page and Jenny Lynn Page, Minors, Appellee.**

**No. 7880.**

United States Court of Appeals
Tenth Circuit.

Aug. 18, 1965.

Martin Jacobs, Atty., Dept. of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., William T. Thurman, U. S. Atty., and Alan S. Rosenthal, Washington, D. C., Atty., with him on the brief), for appellant.

Paul N. Cotro-Manes, Salt Lake City, Utah, for appellee.

Before PICKETT, LEWIS and SETH, Circuit Judges.

SETH, Circuit Judge.

This is an action brought under the Federal Tort Claims Act, seeking damages for the death of the decedent, Stanley G. Page, who was an employee of Hercules Powder Company. The company is not a party. At the time of his death in an explosion the decedent was employed in the manufacture of solid fuel propellants for model experimental rockets to be used by the United States Government. The work was performed at Bacchus, Utah, in a plant owned by Hercules Powder Company pursuant to a cost plus fixed fee research and development contract with the United States. The contract provided that the Government would supply certain items of equipment and supplies, and the contractor would provide personnel, facilities and also certain material and supplies. The Government acquired title to property which was purchased by the contractor for which reimbursement was to be made. Title was vested in the Government at the time the property was acquired by the contractor. The Government provided in this contract that Hercules was to comply with specific safety requirements, including certain Air Force technical orders, and further was to comply with "any additional safety measures required by the Contracting Officer." There were Air Force officers and civilian personnel located at the plant, and at the adjoining plant where the contractor performed other duties for the Government. The Government employees in both plants numbered approximately one hundred and four. At the plant in question, Hercules employed approximately three thousand persons.

The Air Force officers were charged with the duty of seeing that the contractor performed his duties in accordance with the contract and to see that the contractor properly accounted for and handled Government property. There was an Air Force officer who had the title of "Safety Engineer" whose duties extended to both plants, and it was his responsibility to "monitor" the contractor's safety performance under the requirements of the contract.

The manufacture of the solid fuel propellant required the mixture of a form of gunpowder with a solvent containing plasticizers and 89.95 per cent pure liquid nitroglycerin. This mixture was placed in a mold and was cured under varying conditions for a period of some seven or eight days, after which time the molds were removed from the curing process. These molds consisted of an eleven-inch square aluminum base upon which was placed a cylinder about nine inches in diameter. On top of this cylinder, another aluminum top plate was attached together with certain air hoses. The total mold was about six feet three inches in height and when filled weighed about 340 pounds.

The explosion which caused the death of the decedent and two fellow workers occurred at a time when they were moving these filled molds from the curing room and placing them upon a small trailer to be moved from the curing building. There was provided in the curing room an air hoist which was attached to overhead track. The molds were lifted by means of this hoist and moved through a doorway and with the hoist loaded onto the trailer. At the time of the explosion, three of these molds had been placed upon the trailer, one was in the process of being moved along the track, and four were standing on the floor of the curing room, the ventilating hoses having been removed from their wall connections. The molds so standing were not supported or fixed by any ties or fastenings to the walls or ceiling of the room but were merely standing on the floor by their own weight.

By reason of the force of the explosion, the witnesses found it difficult to determine where the initial explosion took place and were unable to determine the exact cause of the explosion.

As will be hereinafter more fully described, the court found that the Government employees were negligent in that they did not supervise properly the industrial safety practices of the contractor nor did they prescribe additional safety practices or properly inspect the Government property as to safety. The court found that the Government had a duty in this connection by reason of the rights reserved under its contract to prescribe and impose safety regulations in addition to those contained in the contract, and also by reason of the Government's reserved right to inspect the plant and work performed by the contractor. The court further found that the molds were inherently dangerous by reason of their size, shape, and the materials from which they were made. The court therefore rendered judgment in favor of the plaintiffs, and this appeal has been taken by the Government.

As stated above, the trial court found a duty from the United States to the decedent by reason of the contract provisions reserving a right in the United States to prescribe safety requirements in addition to those set out in the contract, and in the right to inspect contractor's facilities and work. The appellee contended below and here that the reservation of such powers to the United States in the contract created a duty to the decedent. The authorities do not however support the argument.

■■ The fact that the contract may have reserved to the United States the right to inspect the work and facilities of the independent contractor, and the right to stop the work, does not in itself override or alter the general rule of non-liability for the torts of the contractor because no duty is created to employees or third parties. This includes the reservation to inspect for the adherence to

contract safety provisions. Kirk v. United States, 270 F.2d 110 (9th Cir.). In the cited case an employee of an independent contractor doing dam work for the United States was killed when a scaffold collapsed and he fell into the river. The claimants contended that the Government officials were remiss in not enforcing the safety regulations as to safety belts, nets and rescue equipment, and in not inspecting more carefully the scaffold and the methods used to move it. The court rejected the contentions and found no duty arose by the contract, by the statute under which the contract was executed, nor by the Government's undertaking a safety program. The fact that the work and duties of the independent contractor and of his employees originate in a contract, in plans, or regulations issued by the Government does not create a duty by it to the employees where there was not such an affirmative control and direction by Government officials over the employees or interference in the work of the contractor as to create conditions where there was in fact no independent contractor. The court in Grogan v. United States, 341 F.2d 39 (6th Cir.), also considered a claim based on the Government's failure to inspect scaffolding used by an independent contractor. It there said there was a right reserved, but no duty was created. The contractor there had designed and built the scaffold. See also Cannon v. United States, 328 F.2d 763 (7th Cir.).

■ Could it be that the United States is liable because although it may not have a duty, it undertook to administer a safety program and thereby became liable for its negligence in carrying it out? Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, and Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354; Grogan v. United States, supra; Kirk v. United States, supra. In Blaber v. United States, 332 F.2d 629 (2d Cir.), the court considered an accident which took place in the laboratory of an independent contractor who was conducting contract research and development work for the Atomic Energy Commission. The claimant was killed when an explosion occurred while employees were burning thorium. The court in the cited case referred to the periodic inspections made by AEC representatives of the contractor's plant to see that safety regulations were complied with. The Commission also received periodic reports on safety, it conducted air sample and other tests with regard to radiation. The court found that the doctrine of Indian Towing Co. v. United States, supra, and Rayonier, Inc. v. United States, supra, did not apply. The court in Blaber held that the contractor had the primary responsibility for safety of its employees and the contractor was charged with and supervised the particular duty which was being performed when the thorium exploded. The same standards are applicable to the case at bar. Hercules had the primary responsibility for the safety of its employees; it had the direct control and supervision over them, and they were working in its plant. Further, it had the duty to perform and supervise the individual functions, the total of which produced the end product. The function the decedent was performing was but one of many of these in this chain of production. It and the safety of those then working was under the exclusive control and supervision of Hercules. The safety program of the Government did not constitute an exercise of any such control. The fact that the activity may be dangerous has no consequences on this issue. See Wallach v. United States, 291 F.2d 69 (2d Cir.). See also Buchanan v. United States, 305 F.2d 738 (8th Cir.); Nyquist v. United States, 226 F.Supp. 884 (D. Mont.).

The trial court found that the "exact cause" of the explosion was unknown, that the first detonation occurred inside the center bay of the building, " * * * and the greater probability, but while still conjecture, is that an FPC mold set was either pushed or pulled over or that an object or thing impacted with a mold set with sufficient force to detonate it."

The immediate supervisor of appellee, and of the other two men killed, had stepped out of the building where the explosion took place just before it occurred. He testified that when he left, one of the mold sets or containers was raised on a hoist while being loaded on a small trailer outside the building. He instructed the men to straighten out the container, and departed for other duties without waiting to see what was done. At this time there were several molds already loaded on the trailer and also several still in the room inside the building. As mentioned, the court found the initial detonation to have taken place inside the room. From the record it would appear that this was fairly near the doorway through which the molds were being loaded on a trailer. These findings of the court would indicate that the failure was a human one which caused one of the molds to fall, being knocked or pushed in some manner by the workmen, or struck with some object.

■ The trial court also found that " * * * employees of the United States omitted to properly supervise the activities of Hercules * * * in maintaining safe industrial practices * *." The court apparently felt this resulted from inadequate inspections and from a failure to initiate different procedures. There was however no evidence that would show what "practices" or manner of performing the work was inadequate or dangerous nor what should have been done instead. There was also no showing of any causal connection between any improper "practice" or defective equipment and the accident. All of the testimony bore on the design of the molds, and the testimony that one in the room in question had leaked. The court's finding that one had fallen or been struck precludes a causal connection between the fact one leaked and the accident. The matter of the design of the mold will be considered below. Thus the finding of a failure to supervise has no connection with the accident.

What of the design of the molds? The court found that they were " * * inherently and intrinsically dangerous due to their instability * * *." The court found that prior to loading the molds were standing upright on the floor of the room, and were not supported by ties or fastenings. The molds were six feet three inches in height, weighed about 340 pounds when filled and stood on a square aluminum base plate " * * having a center width of 11 inches * * *." The court found that the mold was designed about 1946 at a plant operated by Hercules but owned by the United States, that the plans belonged to the United States, and that Hercules had made the molds in question. It also found that the molds were in the possession of Hercules, but on termination of the contract, or on demand, possession by Hercules of the molds had to be surrendered to the United States. The molds were marked with Air Force or Navy identification numbers. The design for the molds was approved by representatives of the United States. These findings are all supported by the record, and were not in substantial dispute.

■ The Government acquired ownership of the molds by virtue of the reimbursement contract with Hercules. This ownership was real, but it was technical in the sense that the United States never had possession nor exercised control over the molds. As mentioned, they were manufactured by Hercules, an independent contractor, used only by it and never out of its possession. They were so used at the time of the accident and before in its own plant where the contract was being performed. The United States thus did not in fact "supply" the molds to Hercules; instead Hercules made them itself and the design was of its origin apparently in 1946 although it belonged to the United States and was approved

by it. Apparently the trial court arrived at its conclusion on this point from ALI Restatement, Torts § 392. The rule there stated is limited to circumstances where the chattel is "supplied" by the person sought to be held liable, and was at one time in its control and possession. The typical situation would be where such person made or assembled them, then furnished or "supplied" them to another. The cases of Reynolds v. American Foundry & Machine Co., 121 Utah 130, 239 P.2d 209, and Palmer v. Wasatch Chemical Co., 10 Utah 2d 383, 353 P.2d 985, both concerned chattels furnished to another after a period of possession and control by the person sought to be held liable. Under the facts before us, the United States was not a "supplier" within the purpose or meaning of the Restatement doctrine. The Government at most had the bare ownership of the molds, and never had even possession of them.

In any event as to the dangerous chattel issue, the Tort Claims Act contemplates circumstances where there is negligence of a Government *employee* either by act or omission. It does not by its terms include liability imposed by other doctrines having their origin in warranties, in product liability, or in absolute liability. Dalehite v. United States, 346 U.S. 15, 44, 73 S.Ct. 956, 97 L.Ed. 1427; Mahoney v. United States, 339 F.2d 605 (6th Cir.); Dushon v. United States, 243 F.2d 451, 17 Alaska 245 (9th Cir.); United States v. Taylor, 236 F.2d 649, 74 A.L.R.2d 860 (6th Cir.); Strangi v. United States, 211 F.2d 305 (5th Cir.); Harris v. United States, 205 F.2d 765 (10th Cir.); United States v. Hull, 195 F.2d 64 (1st Cir.).

Thus we hold that the United States was not a "supplier" in the sense required to hold it liable under this rule here sought to be applied; in any event the Tort Claims Act does not include liability based on such a doctrine. The Act does not express a policy or purpose as broad or which includes that implicit in the rule sought to be applied.

The trial court concluded that "although not necessary to the decision of the case" because of the inherently dangerous nature of the work, the Government would be liable under Utah law as expressed in Section 427 of the Restatement of Torts for the negligence of the independent contractor. Section 427 provides that:

> "One who employs an independent contractor to do work which is inherently dangerous to others is subject to liability for bodily harm caused to them by the contractor's failure to exercise reasonable care to prevent harm resulting from the dangerous character of the work."

There is no question but that Hercules was a responsible independent contractor properly selected. Also, liability under this theory is not predicated on actual control or interference exercised or reserved by the United States, and the record shows there was none. Rather, the duty imposed upon the United States, if any, stems entirely from the nature of the activity and the hazards it creates to third persons.

The general law on the subject casts serious doubts as to whether the doctrine of nondelegable duty as here involved applies to injuries to employees of the independent contractor. Corban v. Skelly Oil Co., 256 F.2d 775 (5th Cir.), expressly held that it did not so apply. Similar holdings appear in Galbraith v. United States, 296 F.2d 631 (2d Cir.); Sword, Houston Fire & Cas. Ins. Co., Intervener v. Gulf Oil Corp., 251 F.2d 829 (5th Cir.); Hurst, Employers Cas. Co., Intervener v. Gulf Oil Corp., 251 F.2d 836 (5th Cir.); Cagle v. McQueen, 200 F.2d 186 (5th Cir.). The Utah Supreme Court apparently has not been faced directly with this question, but the view

taken by the courts in the above cited cases is supported by dictum in Dayton v. Free, 46 Utah 277, 148 P. 408, and nothing to the contrary has been advanced. But in any event it must be first decided whether an independent contractor is an "employee" within the meaning of 28 U.S.C.A. § 1346(b) so as to render the United States liable for the contractor's negligence under the Federal Tort Claims Act.

■ The Supreme Court in the Dalehite case has interpreted the Tort Claims Act to "require clear relinquishment of sovereign immunity to give jurisdiction for tort actions." Dalehite v. United States, 346 U.S. 15, at 31, 73 S.Ct. 956, at 965. The Tort Claims Act provides that the United States District Courts shall have jurisdiction of claims against the United States for money damages:

"* * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any *employee of the Government* while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C.A. § 1346(b). (Emphasis added).

Thus, a prerequisite to liability of the United States under the Act is that the act or omission be by an "employee of the United States." An independent contractor is not an "employee" of the Government and recovery cannot therefore be had against the United States for Hercules' negligent acts. Dushon v. United States, 243 F.2d 451, 17 Alaska 245 (9th Cir.) (dictum); Strangi v. United States, 211 F.2d 305 (5th Cir.); United States v. Hull, 195 F.2d 64 (1st Cir.) (dictum); Nyquist v. United States, 226 F.Supp. 884 (D.Mont.); Benson v. United States, 150 F.Supp. 610 (N.D. Calif.); Hopson v. United States, 136 F.Supp. 804 (W.D.Ark.).

The case is reversed with direction that the cause be dismissed.